Marcus Boyd v. Commissioner.
Boyd v. Commissioner
Docket No. 3547.
United States Tax Court
1945 Tax Ct. Memo LEXIS 278; 4 T.C.M. (CCH) 293; T.C.M. (RIA) 45082; March 8, 1945
Drayton Heard, Esq., 924 Grant Bldg., Pittsburg 19, Pa., for the petitioner. Robert H. Kinderman, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: This controversy involves a deficiency in income tax for the calendar year 1941 in the amount of $1,117.20. The sole issue is, whether petitioner *279 is entitled to a deduction of $2,966.95, or any other amount, for the taxable year on account of an alleged loss or a claimed bad debt as a result of his participation in a land development in Florida. Findings of Fact Petitioner is an individual residing at Coraopolis, Allegheny County, Pennsylvania. His income tax return for the taxable year was filed with the collector of internal revenue for the 23rd district of Pennsylvania at Pittsburgh, Pennsylvania. Sometime prior to November 20, 1925, petitioner became a signatory to an undated "Memorandum of Agreement", wherein he subscribed for and agreed to pay into a so-called "syndicate" the sum of $3,000, in the event the amount of $59.000 was subscribed. This amount was subscribed and petitioner actually paid $3,000 into the "syndicate". The funds were to be used in financing development work of a corporation to be organized by the parties of the first part to the agreement. The corporation was to be known as the "Brasota Park Development Corporation" which was to ratify and become bound by all the covenants contained in the "Memorandum of Agreement". Among others, the "Memorandum of Agreement" contained the following material *280 provisions: "3. The parties of the first part agree to secure the Syndicate by giving it or its members negotiable promissory notes of the Brasota Park Development Corporation dated the day money is paid over to Syndicate Manager, payable in six months from the date thereof, bearing interest at eight (8%) per cent. per annum, payable semi-annually, subject, however, to this interest being paid from the fund represented by the interest collected by the Syndicate on the deferred notes held by them for each farm sold, and the Brasota Park Development Corporation shall pay any deficit in interest not secured from said farm notes. Said notes shall not be given by the Development Corporation until the subscription moneys shall have been turned over to the Development Corporation by the Syndicate or its manager, and the Development Corporation is not liable to the Subscribers hereto on any subscription until the moneys have been received by the Development Corporation from the Syndicate. It is hereby mutually agreed that said notes may be exchanged for renewal notes for a further period of six months, and those renewal notes again exchanged for renewal notes for a still further period of *281 six months. * * * * *
"5. The parties of the first part agree to further secure the Syndicate by the deposit with it of all of the capital stock of the Brasota Park Development Corporation consisting of twenty-five hundred (2500) shares of no par value stock, to which certificates of stock will be attached blank powers of attorney signed by the registered owners thereof, with the exception of the shares necessary to qualify the directors, and by the original option given for a period of eighteen (18) months to L. Germain, Jr., by the Germain Land & Timber Company, covering the purchase of eight thousand (8,000) acres of their cut over lands, at a price of $50.00 per acre, said collateral security to be returned to the Brasota Park Development Corporation after the Syndicate has received the cash payment in full of the total amount subscribed, and notes for two hundred (200%) per cent. profit." A further provision made the contract subject to "the several covenants, promises and agreements set forth in Article A attached hereto". Article A states that Louis Germain, Jr., and A. A. Germain agreed to form the Brasota Park Development Corporation for the purpose of developing *282 for sale approximately 8,000 acres owned by the Germain Land & Timber Company then under option for a period of 18 months from November 16, 1925, to Louis Germain, Jr., one of the parties of the first part, at a price of $50 per acre. Then follow 17 separate paragraphs which, in substance, cover the manner of development, the sale, the repayment of the subscriptions to the "syndicate", and the division of the proceeds. Among its provisions Article A contained the following provision: "13. The Syndicate shall act as a holding company for said Development Company until such time as each of its members shall have received the amount of his or her subscription and interest thereon, in cash, and the two hundred per cent. (200%) profit, in cash and notes, exclusive of interest upon said notes, whereupon this agreement shall be automatically terminated and the Syndicate shall be dissolved and all collateral held by the Syndicate shall be returned to the Development Company, and all payments which theretofore have been made to it or by It shall be made to the Development Company or by the Development Company, provided that the Syndicate subscribers shall retain their option rights under *283 this agreement, as hereinafter set forth, to purchase land." On or about the 18th day of November 1925, there was purchased with $8,000 of the $59,000 of the fund paid into the "syndicate" 160 acres at the option price of $50 per acre. The deed was taken in the name of Henry J. C. Breker, as provided in the option agreement of October 24, 1925 between the Germain Land & Timber Company and L. Germain, Jr. On the 21st day of November 1925, Breker executed an instrument declaring that title was taken in his name as trustee. On or about October 6, 1926, an additional 10 acres were deeded to Breker, who, on the 17th day of December 1926, executed a similar "Declaration of Trust" with respect to these 10 acres. These two tracts, consisting of 170 acres, were not subdivided into lots. The 8,000 acres under option were cut over timber lands situate in a wild section 26 miles from Wachula, the nearest large town, 10 miles from Maky City, the nearest post office, and 16 miles from Ona, the nearest railroad. Sometime between 1926 and 1930 the Florida land values collapsed and shortly thereafter the Brasota Park Development Corporation became bankrupt and ceased to operate. The so-called *284 "syndicate" did not engaged in any operation of any kind. After the corporation became defunct the "syndicate" made no substantial effort to maintain the upkeep of the 170 acres upon which the improvements had been made. A family was allowed to live rentfree on the demonstration farm, but shortly afterwards moved without notice. The buildings and improvements were allowed to deteriorate and were destroyed by the elements and fire except for a single house. In 1940 this house and 80 acres of the 170 were sold for $700, $350 cash and a mortgage for the balance which became in default at maturity on December 15, 1940. The mortgage was placed in the hands of an attorney for the purpose of foreclosing thereon. Fire, however, destroyed this building and the "syndicate" recovered the balance of the purchase price from the insurance proceeds on July 2, 1941. The remaining 90 acres were sold in 1940 at $2 per acre. A participation certificate in the defunct bank for $216.48, which the "syndicate" members refused to take over, was sold through a broker on October 20, 1941 for a net price of $97.35. The "syndicate" kept no books of account except a check book. The primary purpose of the organization *285 of the "syndicate" was to create a fund for financing the development work by the proposed corporation. The $59,000 subscribed was to be an advance or loan to the new corporation when organized. The loan was evidenced by promissory notes of the Brasota Park Development Corporation issued to each of the "syndicate" subscribers. The shares of stock of that corporation, the deeds of trust covering the 170 acres of land, and the option agreement covering the 8,000 acres were all held as collateral for the repayment of the moneys advanced by the "syndicate" members. Prior to 1941 petitioner received distributions of $240. In 1941 he received his pro rata share of the proceeds realized from the sale of the 170 acres and the sale of the deposit certificate in the defunct bank, aggregating the sum of $33.05. In 1941 he credited the $33.05 against the notes and claimed a loss of $2,966.95, being the difference between his $3,000 subscription and the 1941 distribution of $33.05. Opinion Petitioner in his income tax return for 1941 claimed a deduction of the amount of $2,966.95 as a bad debt under section 23 (k) of the Internal Revenue Code. [1] The respondent disallowed *286 the deduction on the ground that the loss had not occurred in that taxable year. At the hearing the petitioner claimed that by virtue of the transactions detailed in the findings of fact he purchased an equitable interest in real estate and that his loss thereon became definite in the tax year, thus entitling him to a deduction of the amount thereof under section 23 (e)(1) of the Internal Revenue Code. [2] The Germain Land & Timber Company, which owned the tract, granted to Louis Germain, Jr., an option to purchase 8,000 acres for a price of $50 per acre. The option was for a period of 18 months. Louis, Germain, Jr., was one of the parties who was to organize the corporation which was to develop the land into small five-acre farms to be sold by a real estate agency at $1,000 per unit. The agreement provided that certain of the moneys advanced by the "syndicate" were to be used to purchase land for the purpose of erecting a plant and demonstration farm, and the balance was to be utilized in the development of the tract for sale as small farms. As security for the moneys advanced, it was provided that the title to the 170 acres was to be taken in the name of a trustee. *287 The stock of the corporation also was to be pledged to the "syndicate" to secure the advancement. Notes of the corporation were issued to each member of the "syndicate", representing the respective amount each advanced to the "syndicate". These notes bore 8 per cent interest. If the contemplated development proved successful, each member was to receive 200 per cent profit upon the amount advanced. Upon the repayment of the notes and the stipulated profit to the members, the land held in the name of the trustee and the stock were to become the property of the corporation which was formed under the name of the Brasota Park Development Corporation. *288 We think it is apparent that the "syndicate" was not formed for or carried on any trade or business. The sole purpose was to furnish financial assistance to a corporation to be formed for the purpose of developing a tract of cut over timber land subdividing it into small farms for sale. The "syndicate" had no other interest than the payment of the moneys advanced and the 200 per cent profit if realized. When the amount of $59,000 was subscribed and the corporation delivered its promissory notes to the individual subscribers for the amount of their respective subscriptions the purpose of the "syndicate" was fulfilled. Thereafter it acted merely as agent for the individual subscribers in collecting and disbursing the moneys the "syndicate" members were entitled to receive. The subscribers to the "syndicate" upon receiving the promissory notes of the Brasota Park Development Corporation became its secured creditors. That corporation became bankrupt in 1936 and ceased to function, following the collapse of land values in Florida. The "syndicate" held as collateral security for the performance of the obligation to its members title to 170 acres of land. While it was apparent in 1936, *289 when the Development Corporation became bankrupt, that its promissory notes issued to the individual "syndicate" members would not be paid in full, the debt did not become entirely worthless until the collateral security was liquidated. But the petitioner is not attempting to take a partial bad debt loss. Since there is no contention that the notes were "secuties" as defined in section 23 (k)(3) of the Internal Revenue Code, and the evidence indicates the contrary, he could have but was not required to deduct any amount by which the debt became partially worthless when that was ascertainable, under section 23 (k)(1) of the Internal Revenue Code. Under that section he had the right to, as he did here, wait until the debt became totally worthless and deduct it in the year in which that occurred. Kessler Oil & Gas Co., 41 B.T.A. 31. In 1940 the "syndicate" sold the 170 acres of land held as collateral, but a part of the purchase price was not paid until July 2, 1941. The "syndicate" also held for the benefit of its members a certificate of deposit in a defunct bank. This asset was disposed of in 1941. Thereupon the "syndicate" *290 made a distribution of the proceeds to its members. The petitioner's pro rata share was $33.05. The remainder of the debt became totally worthless in the taxable year 1941. Collin County National Bank v. Commissioner, 48 Fed. (2d) 207; Hennepin Lumber Co., 19 B.T.A. 280: Benton Harbor State Bank, 20 B.T.A. 1106. Since we have determined that the petitioner was a secured creditor of the corporation, the amount of $240 distributed to him in the years prior to 1941 must be applied in reduction of his original subscription. The petitioner received the total amount of $273.05, and his deductible bad debt loss is $2,726.95, being the difference between his $3,000 subscription and the amount he received. Decision will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (k) Bad Debts. - (1) General Rule. - Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. This paragraph shall not apply in the case of a taxpayer, other than a bank, as defined in section 104, with respect to a debt evidenced by a security as defined in paragraph (3) of this subsection. ↩
2. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net expenses there shall be allowed as deductions: (e) Losses by Individuals. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - (1) if incurred in trade or business;↩